Case is taken under advisement. The court will proceed to the fourth case. Duncan v. Asset Recovery Specialists. Mr. Pagel. May it please the court. I am Attorney Brian Pagel of Lawton & Cates. I represent the Plaintiff Appellant Danielle Duncan in this matter, which is on appeal from the District Court's grant of summary judgment in favor of the defendants on a Fair Debt Collection Practices Act case. Your Honors, the Fair Debt Collection Practices Act is meant by Congress to curb abusive debt collection practices, and every action brought under the FDCPA has to be interpreted and ruled on in such a way as to further that purpose. And what happened here runs directly contrary to both the express purposes of the Fair Debt Collection Practices Act and to the way this court has instructed lower courts to interpret communications in connection with debt collection. This case presents, as we said in our briefing, an extension or the contrary of the Natalin case from 1999, in which this court first held that a repossession agent such as Asset Recovery, Mr. Strandley here, could be held liable under the Fair Debt Collection Practices Act if that repossession agent was attempting to collect a fee that might be paid to an underlying creditor. That is, of course, the classic definition of a debt collector under the FDCPA, someone who is attempting to collect money alleged to be owed to another. And the alleged is important here, as is the fact that the purposes of the Fair Debt Collection Practices Act are to be furthered under this court's instructions by reviewing communications not through the eyes of a federal judge or experienced counsel or even the repossession agent, but through the eyes of an unsophisticated debtor. And that's really what's at the heart of this, is whether a jury could have believed that Asset Recovery and Mr. Strandley, its principal, were demanding payment on behalf of Wells Fargo. Not whether they were, in fact, intending to take $100 from Ms. Duncan in exchange for her personal property and pay that to the Wells Fargo loan, but whether an unsophisticated debtor would have interpreted the entire sequence of events leading up to this confrontation in the shop at Asset Recovery as being a demand that Ms. Duncan not only pay $100 to get her personal property back from her car, but that that $100 would then be transferred to Wells Fargo, someone other than the person for whom Mr. Strandley was collecting. In this case, the facts become very important because it begins with Ms. Duncan's car being repossessed without her knowledge, and she contacts ultimately the police and learns that her car has been repossessed without her knowledge, and she calls up the creditor, Wells Fargo. And one of the first things the creditor says to her is not only do you have to pay $4,700 to us to redeem your car, but they also told her you need to pick up your personal property soon or you might pay a fee. And that's the first communication that helps inform how you can interpret this case and how you should interpret the unsophisticated debtor standard. Because Ms. Duncan begins with a question of how can she get her car back, and Wells Fargo affirmatively solicits and says you need to get there and get your personal property before you have to pay a fee. And Ms. Duncan is not just making this fee up out of whole cloth. This isn't something she invented after the fact to create trouble for Mr. Strandley. There's evidence in the record to suggest that Wells Fargo not only authorized Mr. Strandley to charge a $100 fee, but that Mr. Strandley was in fact attempting to do so. The form submitted by the defendant... We know, don't we, at the end of the day that's not ultimately what occurred. I think your characterization of what happened in the early phases of it may be accurate, but at the end of the day it was communicated clearly to her, was it not, that she didn't have to pay the $100? Are you referring, Your Honor, to when the police officer met with Ms. Duncan and Mr. Strandley during the incident recovery or during the interaction between Mr. Strandley and Ms. Duncan? I think either of those are worth discussion, but both of them avoid the question of whether a Fair Debt Collection Practices Act violation occurred prior to the change in the form of the police intervention. Because what Ms. Duncan testified to is that on the phone Mr. Strandley repeatedly told her she had to pay $100 and that he presented her... What's the damage? The damage? Yeah. What's the harm? Well, the harm is that she would have to turn over $100 to get her personal property back or, as in this case, she lost her personal property. So she lost $100 worth of personal property, not to mention the distress that was caused by... How did she lose the personal property because of the phone call? It was clearly explained to her, and it was even written on the form, that the $100 would be paid by Wells Fargo. Well, that leads back to... So how did she lose her personal property? She did. As a result of this $100 business? She lost her personal property as a result of the $100 business because the repeated attempt to collect $100 from her led her to distrust the form that she was confronted with, and she would not sign a form that appeared to her to be requiring her... So is there a special rule for people who are paranoid, who think that the form... Whatever's on the form, that's not true. I'm just not believing it, and therefore I won't sign it, and therefore I won't get my property, and therefore I'm entitled to bring a lawsuit. That's a very strange kind of argument. The special rule, Your Honor, is that you have to interpret the communication in the light of what an unsophisticated debtor would interpret it as, and in that respect, what Ms. Duncan testified to is that the form she was presented with did not have the handwritten notation about no fees being billed to her and the fees being billed to WFDS. She said that she was presented with a form that described her as the debtor, that imposed a $100 fee, and that she was asked to sign. And in the eyes of an unsophisticated debtor, it doesn't require any special paranoia for an unsophisticated debtor to believe, especially in light of the prior communications, that she's going to have to pay the $100 or will be billed by Wells Fargo $100. Now, Ms. Duncan also testified... I mean, she tested... In the back of the red brief, they attached excerpts of her deposition testimony from pages 144 and 145, and she seems to acknowledge that, yeah, they did explain to me that Wells Fargo was going to cover that fee for me. Well, she explains that the police officer and Mr. Strandley, after the initial confrontation with Mr. Strandley, told her that she was not going to be charged any fees, but that occurred after she had been confronted with the form that she interpreted as requiring a $100 fee, and that is not the form that the defendant submitted to the court. As we Ms. Duncan actually viewed, she testified that her deposition was different than the form the defendant submitted, and Ms. Duncan, one of our contentions is that Ms. Duncan should have been allowed, under the federal rules of evidence, to testify to the jury what the contents were of the form that she viewed, and the jury would then be the arbiter of whether that form existed and what it said. And so, the after-the-fact explanation by Mr. Strandley and the police officer don't serve to, as the district court appeared to You can't cure an FDCPA violation that's already occurred. What happened when the police officer intervened and spoke with Ms. Duncan and Mr. Strandley is that the police officer helped Mr. Strandley not commit a second violation of the FDCPA, and that may or may not be relevant to the damages Ms. Duncan incurred, but it's not relevant to whether all of the interactions prior to that constituted a violation of the FDCPA. You can't have a police officer come and unviolate the FDCPA any more than the police officer could have unbroken Ms. Duncan's leg if Mr. Strandley had caused her a personal injury. Mr. Spiegel, as to the form that Ms. Duncan says she first saw, was she in possession of that form? She was not ever allowed to possess that form. Well, who showed that to her? Mr. Strandley showed it to her in the shop. That was her testimony at her deposition. Did you have any discovery with regard to that form? We requested in discovery that Mr. Strandley and Asset Recovery produced the form that was showed to Ms. Duncan. They produced the form that was attached as Exhibit B to Mr. Strandley's affidavit. Ms. Duncan testified at her deposition that that Exhibit B was not the form that she viewed in Mr. Strandley's shop. And the deposition of Mr. Strandley, he says that's the only form that exists? That is Mr. Strandley's testimony, yes. He indicates his testimony was that only one form ever existed and that was the one that Ms. Duncan saw, which I think creates the quintessential material issue of fact in this case, which is whether a jury should have been allowed to decide which form existed and if this one that Ms. Duncan testified existed was believed by the jury, then the jury could certainly infer a Fair Debt Collection Practices Act violation. She requested at the time she viewed it to possess it and it was denied to her? Mr. Strandley would not let her possess the form, that's correct. He would not let her keep a copy of it or take a copy with her in any way. She requested to do that? I believe she requested a copy of the form when she was talking with the police officer, but she was not ever allowed to take a copy of the form or photograph the form in any way. She was very clear about that in her testimony. I did want to reserve some time for rebuttal. I have 20 seconds left, so if there's no further questions, I'll reserve my 20 seconds. Thank you. Thank you. Mr. Erke? May it please the Court, I'm Bill Erke, I'm representing the appellees here. I had an argument put together based on the typical outline with highlighting in multiple colors, but I've got to address a couple things that you asked Mr. Pagel. There is nothing in the record that she asked Mr. Strandley for a document or a copy of a document. Mr. Pagel just indicated to you, the police officer showed it to her, she may have asked him. There's nothing in the record that she asked Mr. Strandley for. Secondarily, he's trying to create a question of fact on the existence of a non-existent document. Judge Connolly in his decision handled that very nicely and very cleanly and said she testified, not what was in the document, and she's not capable to do that as we sit here today, but she said it was completely typed. There was no handwriting on it. That's the document that is in the exhibits and that we have produced, which by the way, in response to your question, 257 pages of discovery, all of the Wells Fargo documents, all of the asset recovery documents were produced. And other than counsel accusing us of hiding something, which I don't think he's doing, there was no other document. So the theory here is, it should have gone to a jury so that Ms. Duncan could testify the same way. I don't have a copy of a document, I can't tell you what it said, all I know it was typewritten, but I speculate that it required me to pay a fee. So I don't think that gets anywhere near the standards that Judge Connolly appropriately addressed. Going back to a couple other things, Mr. Pagel said, he talked about the Madeline case, which I think Judge Connolly handled and applied perfectly again here. Counsel just indicated to you that the question in Madeline was whether or not a fee collected by a repo agent might be paid to a lender. That's not what Madeline says. Madeline says that before you even get to that point of case, you have to plead that a request was made by a repo agent on behalf of the lender and you have to plead and show that if that fee is paid, it is going to go to satisfy the original loan obligation. And there's nothing in the record to indicate that. With counsel indicates to you that Ms. Duncan would testify to a jury and that creates what he called a quintessential fact, question of fact. What really happened here, and Judge Connolly addressed this also, in her deposition testimony in February of 2017, she said when asked to describe all of her phone conversations with Mr. Strandley, all she said was he told me where to get my car. That's all there was, and Judge Connolly saw that, and then a month later gets an affidavit that completely contradicts that testimony, and Judge Connolly, to his credit, went right up to the edge of confirming that was a sham affidavit, and yet said it doesn't matter, because Judge, what you just asked about, we go the next to the February 16th, and everybody is on the same page. There's no fee that's going to be charged to Ms. Duncan, and she knows it. And so, this evidence she talked about is contradictory evidence to her own original deposition testimony. I also hit on the Natalyn case. It's important, although I know it's not evidence, but paragraph 46 of her complaint, her own complaint, states that the personal property was not security for the landlord. That ends the Natalyn question, because Natalyn requires that if you're charging a fee, and you get the fee, you have to take that money and satisfy the loan obligation, and that just doesn't exist here. So, we get to that point, then, on this aspect of, well, there were these phone calls, and then there was a discussion on February 16th, and again, her own complaint in paragraph 21 says she was told by Greg Stranley she didn't have to pay a fee, and then she went to asset recovery specialists on February 16th. So, she wrote over there knowing she didn't have to pay a fee. She looked at the form, the only one in record, and it says nothing about her paying a fee. When the question comes up, Mr. Stranley says, I'll write on here, all fees billed to Wells Fargo Dealer Services. And then, I noted that Judge Connolly didn't pick up as much on this as is clear, but this whole idea of potentially whether or not this fee, as counsel just referred to, is going to get transferred to Wells Fargo. The appellant's own appendix at page 32 has a fee schedule, and he would have you believe that that means that there's fees here that he's going to collect from Ms. Duncan and then send them on. What he missed there is the very bottom paragraph there, and this is the agreement between Wells Fargo and Stranley. Page 32 the appendix to the brief of appellant. The vendor, Greg Stranley, an asset, agrees that these fees are comprehensive and all-inclusive to services rendered on Wells Fargo assignments and invoiced to Wells Fargo Bank N.A. And no other charges associated with related Wells Fargo's customers will be assessed to the customer on the transaction. And he won't go there. Instead, he tries to indicate that something on that fee schedule shows that he never was going to, and then send that to Wells Fargo, which he is not going to. And so that's another indicator of why there was no reasonable question of fact here that a jury could look at and say he was going to charge a fee. Even if he was going to charge a fee, in and of itself, that's not a violation, and they don't even go far enough in the pleadings, much less the evidence or the facts, to show that there is a fee that might even get near the Natalin case. And so the confirmation there is that there was never any contemplation that Greg Stranley or Asset Recovery were going to collect the fee and then send that to Wells Fargo, much less any indication that that fee was then going to be used to satisfy Ms. Duncan's obligation under the loan. So there's a lot of after-the-fact creation of material question of fact after the summary judgment was filed, and I don't think Judge Conley bought into it, and I think that was the appropriate approach. Counsel said a couple of things about unsophisticated users or debtors, and then he goes and he himself cited the McMillan case, and I wanted to jump to that because that's misquoted and that doesn't apply here. This was not a letter, a dunning letter, in McMillan that went to the debtor there and said you're either honest or not, and there was a question of whether it was false or misleading. Here we don't have a dunning letter. We have a form that is handed to a woman on February 16th and explained to her, not only by Mr. Stranley, but by a police officer who she called, and this is not a case where Mr. Stranley called the police for any help or did anything. McMillan was a 12B6 motion and all the court there could do was look at the pleadings. Here we have much, much more than the pleadings, although I submit that those portions I quoted earlier show that she really wasn't going or concerned about this aspect and this unsophisticated debtor thing. We never saw any of that until the reply or the response brief. There's no pleading of that. There's no indication that a false and misleading letter or form had been provided to her. There still is no such thing in the pleadings. And so on McMillan, again, it wasn't mailed, but the unsophisticated user claim, which doesn't apply here, if you did use that, how can someone claim their unsophisticated when it's explained by two different people, you don't have to pay anything, and then it's made note on the one form of evidence, all these fees will be billed to Wells Fargo. So I don't think there's any traction to the last minute unsophisticated user claim. Still no allegation in the pleadings to that. Based on the information and all that, I would ask this Court to affirm his dismissal of the Fair Debt Collection Practices Act, which was, by the way, made only against Greg Stranley and never against Wells Fargo, which also is reflected. So I thank the Court for its time and appreciate the attention. Thank you, Mr. Herkey. Thank you. Mr. Pagel, you may have the full minute. Thank you, Your Honors. With respect to the question of whether Ms. Duncan testified to the inability to obtain the paper, her affidavit, which is in our appendix at page 18, paragraph 19, says, Strandley would not change the paper and would not let me keep a copy of the paper for my record. So there is testimony in the record to that effect. With respect to the form, Ms. Duncan testified that the form she saw had no handwriting on it. The page submitted by the Defendant's Appellants and Discovery in this case was supplemental, appendix page 32, that does have handwritten notations on there. But there's another typewritten difference. Ms. Duncan testified that the paper she looked at said assessment fee. The Exhibit B to the defendant has handling fee of $100. Attorney Herkey pointed out the differences in, or the language in the Wells Fargo fee schedule. The important thing there is that the Wells Fargo fee schedule sent to Mr. Strandley expressly says that asset recovery and Mr. Strandley are to and a redemption reinstatement fee to Wells Fargo of $100. Again, those would be things that the jury could take into account in saying, was Mr. Strandley at least allegedly trying to collect $100 to pay to Wells Fargo? It doesn't have to be applied to the loan. It doesn't have to be applied to her car account. It just has to be Mr. Strandley trying to collect $100 that Ms. Duncan believes is going to go to Wells Fargo. And the debt collector in the end cannot avoid liability by saying the fee I was trying to charge is not actually a fee that existed. And that's what's really at issue in this case. Thank you. Thank you, Mr. Pago. Thank you, Mr. Herkey. The case is taken under advisement.